UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA GARCIA,

Plaintiff,

-v-

NYC HEALTH & HOSPITALS CORPORATION *doing business as* NYC HEALTH + HOSPITALS,

Defendant.

19 Civ. 997 (PAE)

<u>OPINION AND ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Joshua Garcia brings this action against defendant New York City Health and Hospitals Corporation ("H+H"), which operates New York City's public hospitals. Garcia works as a hospital care investigator ("HCI") in the Managed Care Department at the Woodhull Medical and Mental Health Center ("Woodhull Medical") in Brooklyn, New York. He has been employed by H+H since 2010. He alleges that H+H discriminated against him by failing to promote him, fostering a hostile work environment, and retaliating against him on the basis of his race, sexual orientation, and disability. He brings these claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) *et seq.* ("Title VII"), the Americans with Disabilities Act of 1990, 42 U.S.C. § 2000 *et seq.* ("ADA") (as amended 2008); the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1964, 42 U.S.C. § 1983; and the New York City Human Rights Law ("NYCHRL").[1]

---

[1] Although the initial complaint asserted claims under the New York State Human Rights Law ("NYSHRL"), the First Amended Complaint ("FAC") does not. The Court assumes that Garcia has dropped these claims.

Pending now is H+H's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants H+H's motion in its entirety.

I. **Background**[2]

A. **Facts**

1. **The Parties**

H+H is a non-profit organization that operates the public hospitals in New York City. Since May 2010, Garcia has worked for H+H at Woodhull Medical and Mental Health Center as a hospital care investigator. FAC p. 3 ¶¶ 16, 18.[3] Garcia is a gay Hispanic man who suffers from several mental health conditions as well as HIV. *Id.* p. 2 ¶¶ 13–15. As summarized below, throughout his employment as an HCI at Woodhull Medical, Garcia was transferred among workstations within the hospital.

2. **Overview of Garcia's Factual Allegations**

In August 2017, Wedith Pascal became Garcia's supervisor. *Id.* p. 4 ¶ 23. In September 2017, Pascal promoted one of Garcia's co-workers, Marie Louissaint, to an unspecified management position. *Id.* p. 4 ¶ 30. According to Garcia, this position had not been posted online in accordance with H+H's policies. *Id.* p. 5 ¶ 31. Garcia believed that Louissaint had

---

[2] The Court draws the facts in this opinion principally from the FAC. Dkt. 17 ("FAC"). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as true, drawing all reasonable inferences in Garcia's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[3] The paragraphs in the FAC are not numbered consistently, and repeat themselves in several places. *See* FAC pp. 16, 23, 24, 25, 26, 28. The Court will therefore cite the FAC by both page and paragraph number.

been promoted instead of him as a result of discrimination by Pascal on the basis of Garcia's race, sexual orientation, and/or disability. *Id.* p. 5 ¶ 32, p. 21 ¶¶ 136–41. Garcia complained to his union. *Id.* p. 5 ¶ 33.

Following his union complaint, Garcia observed a co-worker monitoring his attendance and performance, and surmised that this was being done at Pascal's direction. *Id.* p. 5 ¶ 35. Pascal then informed Garcia that she was aware that he had filed a union complaint against her and that he would be relocated to a workspace in the Rehab Office. *Id.* pp. 5–6 ¶¶ 36–38. Garcia told Pascal that the proposed workspace would exacerbate his mental health conditions, including his claustrophobia. *Id.* p. 6 ¶ 39. Garcia later provided Pascal with medical documentation of his condition, and asked to remain at his workspace in the Managed Care Department. *Id.* p. 6 ¶ 41.

This marked the beginning of a series of communications between Garcia and H+H, in which H+H informed Garcia that he would be relocated to various workspaces in the hospital, and Garcia objected on account of disabilities. Between September 2017 and September 2018, H+H relocated or attempted to relocate Garcia's workstation from the Managed Care Department to the Rehab Office, *id.* pp. 5–6 ¶¶ 36–38, the Pharmacy Department, *id.* p. 8 ¶ 60, several unspecified workspaces, *id.* pp. 11–12 ¶¶ 80–82, p. 14 ¶ 96, the Patient Accounts Office, *id.* p. 16 ¶ 107, the Accounts Receivable room, *id.* p. 17 ¶ 112, and the Rehab Office again, *id.* p. 18 ¶ 117. Garcia alleges that, despite his medical documentation, H+H repeatedly refused to engage in good faith in reasonably accommodating his condition, and that Pascal's repeated attempts to move him from his workspace in the Managed Care Department were acts of retaliation for his union complaint about Louissant's promotion.

Separately, Garcia alleges that he was subjected to other acts of retaliation, including further monitoring of his performance and attendance by a co-worker, *id.* p. 6 ¶ 45, and a baseless accusation by a co-worker that he had become irate and pushed her, *id.* p. 16 ¶ 110.

Garcia also alleges that on several occasions, Pascal and other hospital employees improperly disclosed protected information about his medical conditions. On one occasion, Garcia alleges, Pascal publicly questioned him about his disabilities in response to his request for Family Medical Leave Act ("FMLA") leave. *Id.* p. 4 ¶¶ 26–29. On another, Garcia alleges that H+H Equal Employment Officer ("EEO") David Smart, in a meeting about Garcia's reasonable accommodation requests, "began probing [Garcia] about the events which triggered [his] anxiety and panic attacks." *Id.* p. 10 ¶ 70. Garcia also alleges that Smart improperly disclosed his health information to another EEO, James Keys. *Id.* p. 10 ¶ 73. Garcia further alleges that another supervisor, Joelle Auguste, improperly asked Garcia about the circumstances surrounding his FMLA leave, inquired with human resources about Garcia's FMLA status, and then sent Garcia an email, on which other employees were copied, in which Auguste disclosed information about Garcia's FMLA leave for his mental health and claimed that Garcia's leave had expired. *Id.* p. 18 ¶¶ 113–16.

Finally, Garcia alleges a number of incidents that he claims amounted to a hostile work environment. The Court first summarizes the incidents predating Garcia's complaint to the New York State Department of Human Rights ("SDHR") on January 4, 2018, and then those that occurred afterwards.

### i.    *Before January 4, 2018*

Garcia alleges that, on four occasions between September and December 2017, Pascal verbally berated him and/or slammed her hands on a desk while speaking with him. *Id.* p. 6 ¶ 44, p. 7 ¶¶ 51–52, p. 9 ¶ 66, p. 10 ¶ 68. On October 11, 2017, Garcia alleges that he overhead Pascal

and Smart speaking in Haitian Creole and referring to him as a "faggot." *Id.* p. 8 ¶ 55. The following day, Garcia alleges that he entered a room and one of his co-workers "began singing religious music while sitting at a table with an open bible" and then said, in what Garcia perceived to be a reference to him, "God Bless him. God Bless everyone." *Id.* p. 8 ¶ 57. In December 2017, Garcia's supervisor Auguste, in an email requesting Garcia's schedule of medical appointments for which he had requested FMLA leave, stated that it was "unfair" to staff members who had to cover Garcia's shifts. *Id.* p. 13 ¶ 90.

*ii.     After January 4, 2018*

In March 2018, Garcia complained to his union that co-worker Emma Flynn had begun referring to Garcia as "the sick one" in reference to his disabilities and requests to maintain his workstation in the Managed Care Department. *Id.* p. 15 ¶ 105. On July 5, 2018, Garcia alleges that another coworker, Raquel Kenley, placed her hand on Garcia's rear end and commented that she had "never seen a man with a butt so big." *Id.* p. 17 ¶ 109. In August 2018, Garcia's supervisor Auguste refused to sign Garcia's FMLA requests. *Id.* p. 18 ¶ 113. In September 2018, Kenley told Garcia she had decided to nickname him "Skittles," which Garcia understood to be a reference to his sexual orientation. *Id.* p. 18 ¶ 118. Thereafter, in December 2018, Garcia alleges that Kenley began throwing Skittles wrappers in the garbage can by his desk, *id.* p. 20 ¶ 130, and, on January 2, 2019, left a bag of green Skittles with a red bow on his desk, *id.* p. 20 ¶ 131. Finally, Garcia alleges that in November 2018, he was subjected to unfounded complaints about his timesheets. *Id.* p. 19 ¶¶ 128–29.

### B.     Procedural History

On January 4, 2018, Garcia filed a complaint of discrimination with the SDHR. Dkt. 19 ("Brown Dec."), Ex. A ("SDHR Complaint") at 5. The complaint was forwarded to the EEOC and, on March 8, 2018, the EEOC notified H+H of the complaint. Brown Dec., Ex. B. On July

6, 2018, the SDHR issued a finding of "no probable cause" and closed the complaint.  Brown
Dec., Ex. C. ("SDHR Findings").  On November 5, 2018, the EEOC adopted the SDHR's
findings, closed its investigation, and issued a right to sue letter.  Brown Dec., Ex. D.

On February 1, 2019, Garcia filed his initial complaint.  Dkt. 1.  On May 23, 2019, H+H
filed a motion to dismiss, Dkt. 13, a supporting declaration of Kimberly K. Brown, Esq., Dkt. 14,
and a supporting memorandum of law, Dkt. 15.

On May 24, 2019, the Court issued an order directing Garcia either to file an amended
complaint or oppose H+H's motion.  Dkt. 16.  On June 12, 2019, Garcia filed the FAC.  FAC.
On July 2, 2019, H+H filed a motion to dismiss the FAC, Dkt. 18, a supporting declaration by
Brown, "Brown Dec.," and a supporting memorandum of law, Dkt. 20 ("Def. Mem.").  On July
18, 2019, Garcia filed an opposition.  Dkt. 21 ("Opp'n").  On July 25, 2019, H+H filed its reply.
Dkt. 23 ("Reply").

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough
facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must be dismissed where, as
a matter of law, "the allegations in a complaint, however true, could not raise a claim of
entitlement to relief."  *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court
must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the
plaintiff."  *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions.  *See*

*Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.     Discussion

### A.     Garcia's Title VII Claim of Discrimination

In his first claim, Garcia alleges that H+H discriminated against him in violation of Title VII, on the basis of both his sexual orientation and race. FAC pp. 20–21 ¶¶ 133–42. This claim challenges H+H's decision to promote his coworker Louissaint over him, and alleges that H+H created a hostile work environment in which Garcia was called derogatory names, yelled at by his supervisor Pascal, and had co-workers leave Skittles candy wrappers near his workstation.

### 1.     Conduct Post-Dating Garcia's SDHR Complaint

H+H first argues that a portion of Garcia's allegations—those based on incidents which occurred after he filed his complaint with the SDHR on January 4, 2018—must be dismissed for failure to exhaust administrative remedies. Def. Mem. at 7–8; Reply at 1–2. H+H is correct.

"Before an aggrieved party can assert a Title VII claim in federal court, he is generally required to exhaust the administrative remedies provided by the statute. That is, a Title VII plaintiff generally must file a charge of discrimination with the EEOC 'within three hundred days after the alleged unlawful employment practice occurred,' 42 U.S.C. § 2000e-5(e)(1), and must then file an action in federal court within 90 days of receiving a right-to-sue letter from the agency, *id.* § 2000e-5(f)(1)." *Duplan v. City of New York*, 888 F.3d 612, 621–22 (2d Cir. 2018) (internal citation omitted). Garcia never filed a second EEOC complaint alleging conduct occurring after January 2018.[4] Nor is the later conduct "reasonably related" to the conduct

---

[4] The FAC asserts that Garcia filed an EEOC complaint on March 8, 2018, FAC p. 15 ¶ 101, but this was the date of the EEOC notice informing H+H of its investigation. Brown Dec., Ex. B. Garcia's SDHR complaint was filed on January 4, 2018. SDHR Complaint at 5.

Garcia had previously alleged. *Id.* at 622; *see also Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 (1991). For example, Garcia pleads that on July 5, 2018, a coworker put her hand on his rear end and stated that she had "never seen a man with a butt so big." FAC p. 17 ¶ 109. This conduct finds no precursor in the earlier acts Garcia alleged in January 2018. Similarly, Garcia pleads that beginning in September 2018, a coworker began calling him "Skittles," which Garcia interpreted to refer to his sexual orientation, and later left Skittles wrappers near his workstation. *Id.* p. 18 ¶ 118, p. 20 ¶¶ 130–31. This, too, is completely unrelated to any of the conduct that Garcia alleged in his January 2018 SDHR complaint. The post-January conduct Garcia pleads thus cannot be considered in assessing his Title VII claims.

## 2. Garcia's Failure to Promote Claim

At the outset, the Court notes that Garcia did not include his failure to promote claim in his SDHR complaint. Garcia did not check the box "denied me a promotion / pay raise" in the section of the form that asks complainants to list all discriminatory acts they are alleging. SDHR Complaint at 2. Nor does he mention the failure to promote him in his narrative of H+H's alleged discrimination.[5] *Id.* at 3. And the SDHR's decision, which details the allegations raised by Garcia, does not mention the denied promotion. SDHR Findings at 1–2.

---

[5] Garcia's narrative description, in its entirety, stated: "Since September 2017 I have undergone retaliation, discrimination, and been refused accommodations. A fellow peer had been monitoring my time and I reported it to my union. My manager Wedith Pascal approached me in regards to my report and since then has done everything in her power to make work unbearable. I have written multiple statements reporting such behavior to the union to no avail. I have consistently [illegible] of harassment by Wedith Pascal and David Smart (acting EEO) who[] denied my reasonable accommodation. I was reassigned to a location that all members of management were aware would affect my conditions. I can provide any necessary paperwork to

"It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court. The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action. The administrative exhaustion requirement applies to *pro se* and counseled plaintiffs alike." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (internal quotation marks and citations omitted) (emphasis added).

Had H+H pursued this point, the Court might well have dismissed this claim for failure to exhaust. The requirement, however, "is not a jurisdictional requirement; rather, it is merely a precondition of suit and, accordingly, it is subject to equitable defenses." *Id.* Here, H+H has not claimed failure to exhaust, but instead attacks this claim on the merits, and Garcia therefore had no notice of exhaustion as a basis for dismissal. The Court will not dismiss this claim for an exhaustion defect it has identified *sua sponte*. The Court instead finds that H+H has waived any argument that Garcia has failed to exhaust his administrative remedies with regard to his failure to promote claim. *Francis v. City of New York*, 235 F.3d 763, 766 (2d Cir. 2000) (holding that city had waived any objection that plaintiff failed to exhaust his administrative remedies with regard to Title VII failure to promote claim).

The Court, however, agrees with H+H that Garcia has failed to plead sufficient facts to state a plausible claim of a discriminatory failure to promote. Specifically, H+H argues that Garcia has failed to plead facts making out a prima facie case. Def. Mem. at 15–16; Reply at 4–5. To establish a prima facie case of discriminatory failure to promote under Title VII, a plaintiff must allege that: "(1) [he] is a member of a protected class; (2) [he] applied and was

---

affirm my allegations. Also disclosure of my health conditions violating HIPAA rights and laws." SDHR Complaint at 3.

qualified for a job for which the employer was seeking applicants; (3) [he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004) (citation omitted). Thus, "in establishing a prima facie case the plaintiff must show that '[he] applied for an available position for which [he] was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination.'" *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Garcia has not pled facts to establish that he was qualified for the position for which he was allegedly passed over. Indeed, the only fact he pleads regarding his qualifications is that he has maintained employment in his current position since 2010. FAC p. 29 ¶ 133 ("Mr. Garcia performed her [sic] responsibilities in a satisfactory manner since 2010, evincing that he is qualified for the position."); *see also id.* p. 21 ¶ 137, p. 25 ¶ 158, p. 28 ¶ 174. This, without more, is insufficient to establish that Garcia was qualified for the different, managerial post to which Louissant was appointed. Garcia's qualification to retain his current position simply does not speak to that required element. The Court therefore dismisses Garcia's failure to promote claim for failure to plead a prima facie case. *Brown*, 163 F.3d at 710.[6]

### 3. Garcia's Hostile Work Environment Claim

H+H argues that Garcia fails to allege facts making out a prima facie case of a Title VII hostile work environment claim. Def. Mem. at 16–19; Reply at 5–7.

---

[6] In light of the dismissal on this ground, the Court need not reach H+H's additional arguments for dismissal, including that Garcia has failed to plead that his credentials were superior to Louissant's, Def. Mem. at 16, or to identify the specific promotion he applied for but did not receive, *id*. at 15–16, Reply at 5.

To prevail on such a claim, a plaintiff must establish that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive. The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.

*Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (internal quotation marks and citations omitted). "[A] work environment's hostility should be assessed based on the totality of the circumstances." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted). Factors that may be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (citation omitted).

Significantly, Title VII "does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). "[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*

Finally, to hold an employer liable for such a hostile work environment, "federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work

environment to the employer.'" *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90–91 (2d Cir. 2019)

(quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)).  "Two such bases exist:

strict vicarious liability if an employer's supervisor has created the hostile environment, *see*

*Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015), and negligence if a co-worker

who is not a supervisor has created the hostile environment, and the employer, upon becoming

aware of the misconduct, fails to remedy it, *see Summa*, 708 F.3d at 124."  *Id.* at 91.

Garcia's hostile work environment claim here turns on the incidents that he alleges

occurred before January 4, 2018, the date he filed his EEOC complaint.  The allegations he

makes relating to such a claim—as opposed to the alleged failure to accommodate his medical

needs—are that: (1) Garcia's supervisor "publicly interrogat[ed] [Garcia] about his disability" in

response to his FMLA leave request, causing Garcia to suffer "serious humiliation," FAC p. 4

¶¶ 28–29; (2) Garcia perceived that, on two occasions, a co-worker was monitoring his

attendance and job performance, and that this was at the direction of his supervisor, *id.* p. 5 ¶ 35,

p. 6 ¶ 45; (3) Garcia overheard his supervisor conversing with another employee and referring to

him as a "faggot" in "Haitian," a "dialect" which with Garcia is "familiar," *id.* p. 8 ¶ 55[7];

(4) Garcia entered a room and a co-worker "began singing religious music while sitting at a table

with an open bible" and then said, in what Garcia took as a reference to him, "God Bless him.

---

[7] Much more than a "dialect," Haitian Creole is one of two official languages of Haiti and is spoken by an estimated eight million people worldwide.  Albert Valdman, *Creole: The National Language of Haiti*, INDIANA UNIVERSITY CREOLE INSTITUTE, http://www.indiana.edu/~creole/creolenatllangofhaiti.shtml.

God Bless everyone," *id.* p. 8 ¶ 57; and (5) four incidents in which his supervisor verbally berated him and/or slammed her hands on a desk.[8]

Two of these incidents clearly do not support Garcia's claim. His claim that his performance was "monitored" by a coworker fails, without more, to describe hostile or abusive conduct. And a coworker's religious singing and statements towards Garcia are not acts imputable to H+H, as the coworker is not pled to have been his supervisor. Garcia has not pled that "a supervisor used his or her authority to further the creation of a discriminatorily abusive working environment, or that the employer knew or reasonably should have known about harassment by non-supervisory co-workers, yet failed to take appropriate remedial action." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (internal quotation marks and citation omitted). In any event, this conduct, as pled, occurred on one occasion, and it was not so "extraordinarily severe . . . [as] to have altered the conditions of [his] working environment." *Alfano*, 294 F.3d at 374 (internal quotation marks omitted).

As to the remaining incidents, "assess[ing] [them] based on the totality of the circumstances," *Patane*, 508 F.3d at 113, Garcia has failed to allege conduct that was either sufficiently severe or pervasive to state a hostile work environment claim under Title VII. These acts do not describe "harassment of such quality or quantity that a reasonable employee would

---

[8] Specifically, Garcia alleges: an incident in which his supervisor began "berating [him] while slamming her hands on the table in an aggressive manner towards" him, FAC p. 6 ¶ 44; an incident in which his supervisor "showed signs of physical aggression and slammed her hand on her desk," *id.* p. 7 ¶ 51; an incident in which, after Garcia refused to relocate to a different workstation, his supervisor "abruptly approached [his] desk and started screaming, 'Move now! As I say, I am the Boss and you must do what I say!'" *id.* p. 9 ¶ 66; and an incident in which his supervisor "verbally berate[d] [Garcia] and then aggressively slam[med] her hands on the desk in an effort to intimidate" him, *id.* p. 10 ¶ 68.

find the conditions of [his] employment altered for the worse." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)) (internal ellipsis omitted).

To be sure, the FAC describes an incident where Garcia was publicly questioned about his disability by his supervisor, four incidents where his supervisor yelled at or was aggressive towards him, and an incident where Garcia believes his supervisor referred to him as a "faggot" in another language. But these isolated acts, however inappropriate, do not rise to the level of creating a hostile work environment under Title VII, even considering "all the circumstances." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993); *see Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) ("Conduct that is merely offensive and not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview." (internal quotation marks and citation omitted)). That Garcia's supervisor yelled at him on four occasions over three months is not "sufficiently continuous and concerted . . . to be deemed pervasive," or to make "the workplace . . . so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [Garcia's] employment were thereby altered." *Alfano*, 294 F.3d at 373, 374. The incidents here are merely "episodic." *Littlejohn*, 795 F.3d at 321. They fall well short of the standards to plead such a claim.[9] Critically, too, with the exception of the

---

[9] *See, e.g.*, *Littlejohn*, 795 F.3d at 321 (holding allegations that the employer made negative statements about plaintiff, was impatient and used harsh tones, distanced herself and declined to meet with plaintiff, required plaintiff to recreate work, wrongfully reprimanded plaintiff, increased plaintiff's schedule, and was sarcastic to plaintiff insufficient to support a finding of a severe or pervasive hostile work environment); *Fleming v. MaxMara USA, Inc.,* 371 F. App'x 115, 119 (2d Cir. 2010) (holding that no hostile work environment existed even though "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Mathirampuzha v. Potter*, 548 F.3d 70, 73, 79 (2d Cir. 2008) (holding that incident in which the plaintiff's supervisor "grabbed the plaintiff's arm, punched him in the shoulder and chest, spit in his face, and poked him in the eye" was "not so severe as to alter materially the plaintiff's working conditions"); *Nugent v. St. Lukes-*

incident in which Garcia alleges that he was referred to as a "faggot," the facts alleged do not

link the workplace hostility he encountered to his race or sexual orientation. *Vega v. Hempstead*

*Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015) (to survive motion to dismiss, plaintiff

must "plausibly allege facts that provide 'at least minimal support for the proposition that the

employer was motivated by discriminatory intent'" (quoting *Littlejohn*, 795 F.3d at 311)).

---

*Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (holding that derogatory language from supervisor, dismissive comments from management, and intense scrutiny of plaintiff were together "insufficiently severe and pervasive" to create hostile work environment); *Brown*, 163 F.3d at 713 (2d Cir. 1998) (holding that supervisor's occasional racist remarks "fail[ed] to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment"); *Kearse v. ATC Healthcare Servs.*, No. 12 Civ. 233 (NRB), 2014 WL 958738, at *8–9 (S.D.N.Y. Mar. 11, 2014) (finding that supervisor's repeated reprimands in front of other coworkers, keeping plaintiff at work past end of shift, ignoring plaintiff's questions about his paychecks, restricting plaintiff's use of his paid time off, and comment that plaintiff was getting married to avoid paying child support did not together amount to hostile work environment); *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 644 (S.D.N.Y. 2011) (finding that allegations of work reassignment, schedule changes, increased scrutiny of plaintiff's work, and a supervisor's stray remarks were insufficient to establish hostile work environment); *Gibson v. Wyeth Pharms., Inc.*, No. 07 Civ. 946 (LTS), 2011 WL 830671, at *11 (S.D.N.Y. Mar. 9, 2011) (finding that allegations of explicitly racial comments, three-day suspension, forced overtime, and written warning were insufficient to establish hostile work environment); *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 Civ. 7586 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding that "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, was not enough to show that defendants' conduct was sufficiently severe or pervasive), *aff'd*, 488 F. App'x 530, 531–32 (2d Cir. 2012); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316 (HB), 2009 WL 900739, at *1 (S.D.N.Y. Apr. 3, 2009) (finding conduct not sufficiently severe or pervasive to support a hostile work environment claim where plaintiff alleged that supervisor ignored and spoke to her harshly at meetings; scolded her for not following the chain of command in seeking consent to attend a conference; threatened to transfer her to another department; denied a transfer to the supervisor of her choice; gave her extra duties; stripped her of other duties; referred to her as "black ass" on three occasions; closely monitored her; gave unrealistic time periods to complete tasks; eliminated programs that plaintiff had implemented; and ultimately terminated plaintiff and replaced her with a white female), *aff'd*, 372 F. App'x 137, 139–40 (2d Cir. 2010); *Green v. Harris Publ'ns, Inc.*, 331 F. Supp. 2d 180, 192, 194 (S.D.N.Y. 2004) (granting summary judgment to defendant on hostile work environment claim and finding that two racially discriminatory comments overheard by the plaintiff "were stray remarks at best").

Garcia has failed to plead a prima facie case of a hostile work environment under Title VII.  The Court therefore dismisses this claim.

**B.      Garcia's Title VII Claim of Retaliation**

Garcia next alleges that H+H, through his supervisor Wedith Pascal, retaliated against him for bringing complaints of discrimination.  FAC pp. 21–22 ¶¶ 143–49.  In evaluating Title VII retaliation claims, "courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973)."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  A plaintiff must show: (1) he was engaged in protected activity under Title VII; (2) the employer was aware of that activity; (3) the employer took a materially adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and that adverse action.  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012); *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006).

Garcia alleges that he engaged in protected activity when he filed complaints of discrimination both internally and with the SDHR (which dual-filed his complaint with the EEOC).  FAC p. 22 ¶ 147.  He surmises that his supervisor learned of these complaints via his union, other hospital employees, and the outside agencies.  *Id.* p. 22 ¶ 148.  He further alleges that on at least one occasion, his supervisor stated that she was aware he had filed a complaint. *Id.* p. 5 ¶ 36.  As for acts of retaliation, Garcia claims that his workspace was relocated to other departments, that H+H failed to engage in the ADA reasonable accommodation process in good faith in connection with these moves, that one of his coworkers filed a baseless complaint against him alleging that he had pushed her, and that he was subjected to hostile treatment by his superiors.  *Id.* p. 22 ¶ 149.  H+H responds that Garcia has failed to establish a prima facie case

because he has not pled any facts supporting a finding of a materially adverse employment action.  Def. Mem. at 20–21.

"[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'  This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII."  *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57) (internal citation omitted).  It is not, however, boundless.  The Supreme Court has explained that an adverse action must be *materially* adverse, and that "normally petty slights, minor annoyances, and simple lack of good manners" will not rise to the level of an adverse action.  *Burlington*, 548 U.S. at 68; *see also id.* (citing, with approval, *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998), for the proposition that "judicial standards for sexual harassment must filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" (internal quotation marks omitted)).  The Supreme Court has emphasized that the adverse action standard in the Title VII retaliation context is an objective one.  *Id.*

Turning first to Garcia's claim that his relocation to different workspaces was retaliatory, *see, e.g.*, FAC p. 22 ¶ 149, p. 6 ¶¶ 39–40, p. 16 ¶ 107, p. 20 ¶ 132, Garcia asserts, in a largely conclusory manner, that the new workspaces were significantly worse than the one he had occupied.  While Garcia's relocation is separately germane to his ADA claims, *see infra* pp. 19–27, when measured against the objective standard applicable to Title VII claims, such a relocation, without much more, does not rise to the level of a material adverse employment action, as the case law uniformly reflects.  *See Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 699 (S.D.N.Y. 2011) ("Defendants also contend that Price's move to the eighth floor

does not constitute an adverse employment in the state and city law retaliation context. The Court agrees[.]"); *Cunningham v. N.Y. State Dep't of Labor*, No. 105 Civ. 1127 (DNH), 2010 WL 1781465, at *6 (N.D.N.Y. Apr. 30, 2010) ("Even if the decision to move plaintiff to the first floor was the product of a retaliatory motive, plaintiff's complaints about his new office fall squarely within the class of trivial harms that the *Burlington* Court held Title VII was not intended to protect against."), *aff'd*, 429 F. App'x 17 (2d Cir. 2011); *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *11 (S.D.N.Y. Nov. 30, 2015). Garcia has not alleged any concomitant changes to other dimensions of his job, such as "a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Under these circumstances, a reasonable worker would not have been dissuaded from engaging in protected activity on the basis of a relocation within the hospital alone. *See id.* at 128 ("[T]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." (citation omitted)). And, as Garcia admits in his pleading, he was informed that all of the HCIs, not just him, were being transferred out of the Managed Care Department. FAC p. 16 ¶ 108.

The other actions that Garcia alleges were retaliatory also fall well short of qualifying as material adverse actions. Garcia's claim that his co-worker filed a formal complaint falsely accusing him of becoming irate and pushing her, *id.* p. 16 ¶ 110, does not qualify as an adverse action by his employer, *Kessler*, 461 F.3d at 206, because he has not pled that the coworker was his supervisor or had decision-making authority over him. Garcia's claim that he was subjected to "hostile behavior and treatment" by his superiors in retaliation for his protected actions, FAC p. 22 ¶ 149, is entirely unspecific. *See Iqbal*, 556 U.S. at 678. And Garcia's claim that H+H

failed to engage in good faith in the reasonable accommodation process is not a freestanding basis on which to claim retaliation, but part of the inquiry for his ADA claim.

The Court accordingly dismisses Garcia's retaliation claim, for failure to allege a material adverse action in retaliation for engaging in protected activities.[10]

## C.     Garcia's ADA Claims of Discrimination

Garcia appears to bring two distinct claims of discrimination under the ADA: one for failure to accommodate and another for retaliation.

### 1.     Garcia's Failure to Accommodate Claim

Garcia alleges that H+H discriminated against him in violation of the ADA, 42 U.S.C. §§ 12101–12213 (as amended 2008).  FAC pp. 23–24.

Pertinent here, the ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 § 12112(b)(5)(A).  "Where, as in this case, a . . . plaintiff [with a disability] claims that he can perform a particular job with a reasonable accommodation, the prima facie burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and

_____

[10] In light of this ruling, the Court need not reach H+H's alternative argument, Def. Mem. at 21–22, that Garcia has failed to plead sufficient facts to establish that such actions would not have occurred but for his supervisor's allegedly retaliatory motive.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (to establish prima facie case of retaliation under Title VII, plaintiff must plausibly plead "that the desire to retaliate was the but-for cause of the challenged employment action").

(4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).

Garcia alleges that: his mental health conditions and HIV qualify him as a person with a disability under the ADA, FAC p. 2 ¶¶ 14–15, p. 23 ¶ 112; H+H had notice of his disability as a result of (i) his regular requests for leave under the FMLA, *e.g.*, *id.* p. 3 ¶¶ 19–20, p. 4 ¶¶ 26, 28, and (ii) his later claim that his disability prevented him from working in a different workspace, *e.g.*, *id.* p. 6 ¶ 41, p. 8 ¶ 59 p. 24 ¶ 115; a reasonable accommodation—namely, an "open area with low patient volume and away from contagious patients"—would allow him to complete his assigned duties as an HCI, *id.* p. 12 ¶ 83; and that H+H improperly refused to make such an accommodation, *id.* p. 24 ¶¶ 118–19.

In moving to dismiss, H+H first argues that Garcia has failed to plead sufficient facts to establish that he is a person with a disability under the ADA. Def. Mem. at 23–24; Reply at 8–9. A plaintiff can establish a "disability" under the ADA by, *inter alia*, showing "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).[11] "The Supreme Court has prescribed a three-step process for determining whether an individual is disabled under subsection (A). First, a court must determine whether the plaintiff suffers from a physical or mental impairment. Second, the court

---

[11] Garcia has not pled facts to establish a disability on the alternative bases of having "a record of such an impairment," 42 U.S.C. § 12102(1)(B), or "being regarded as having such an impairment," *id.* § 12102(1)(C). His conclusory statement that he "is regarded as having such mental impairment by his treatment providers," FAC p. 23 ¶114, even if supported by factual allegations, would be insufficient to establish that he is a person with a disability within the meaning of § 12102(1)(C), because this section applies when an individual "establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA.  Third, the court determines whether the identified impairment substantially limited that life activity." *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539 (S.D.N.Y. 2009) (internal citations omitted) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).

As to the first step, Garcia pleads that he suffers from several mental health conditions—"panic disorder, anxiety, post traumatic stress disorder ('PSTD'), and claustrophobia," FAC p. 2 ¶ 14—as well as HIV, *id.*  For the purposes of the ADA, a "mental impairment" includes "[a]ny mental or psychological disorder, such as an . . . emotional or mental illness," 29 C.F.R. § 1630.2(h)(2), and a physical impairment includes, *inter alia*, a "physiological disorder or condition . . . affecting one or more body systems such as . . . [the] immune" system, *id.* § 1630.2(h)(1).  The Court assumes *arguendo* that all of the medical conditions pled by Garcia are qualifying impairments.  As to the second step, Garcia's FAC alleges that his qualifying disability substantially limits him from "working."  Work is listed in the statutory text as an example of a major life activity, 42 U.S.C. § 12102(2)(A), and H+H does not contend that it is not.

The Court agrees with H+H, however, that Garcia's FAC falters on the third step of the analysis.  He has failed to plead sufficient facts to show that these conditions "substantially limit[] one or more major life activities."  42 U.S.C. § 12102(1)(A).  H+H's argument as to this requirement is that the facts pled do not show that Garcia's disabilities "substantially limit" him from "working," within the meaning of the ADA.  Def. Mem. at 23–24; Reply at 8–9.  The EEOC's regulations implementing the ADA, updated after the 2008 ADA Amendments Act

("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), provide guidance on what it means to be "substantially limited":

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).[12] The regulations add that "it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." 29 C.F.R. § 1630.2(j)(4)(i).

Notably, the EEOC's updated regulations no longer include specific language, cited by many of the preceding cases in this Circuit, regarding the major life activity of working. The EEOC's interpretive guidance explains that this is because "[i]n most instances, an individual with a disability will be able to establish coverage by showing substantial limitation of a major life activity other than working . . . [t]his will be particularly true in light of the changes made by the ADA Amendments Act." *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. pt. 1630, app. ("EEOC Interpretive Guidance"); *see Monroe v. County of Orange*, No. 14 Civ. 1957 (KMK), 2016 WL 5394745, at *9 (S.D.N.Y. Sept. 27 2016); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13 Civ. 243 (JFB), 2014 WL 3867560, at *14 n.11 (E.D.N.Y. July 29, 2014). However, even after the ADAAA, "[i]n the rare case[] where an

---

[12] *See Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) ("Because the [EEOC] is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms.")

individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." EEOC Interpretive Guidance. "A class of jobs may be determined by reference to the nature of the work that an individual is limited in performing . . . or by reference to job-related requirements that an individual is limited in meeting." *Id.* Because Garcia has pled that he is substantially limited only in the major life activity of working,[13] FAC p. 2 ¶ 15, p. 23 ¶ 113, the Court applies this guidance.

Garcia nevertheless has failed to clear the low bar required at the motion to dismiss stage. Garcia has pled the following facts regarding his disability: "[H]e cannot be in confined places or places with a high volume of individuals, or near people that are ill/contagious," *id.* p. 2 ¶ 15; "small confined spaces and crowds of people automatically trigger[] panic and anxiety attacks," *id.* pp. 11–12 ¶ 81; and his "medical condition requires that he is in an open area with low patient volume and away from contagious patients as a result of his HIV positive status," *id.* p. 12 ¶ 83. Notwithstanding these limitations, Garcia has also pled that his role as an HCI at the hospital, where he began working after developing these impairments and continues to be employed, requires him, *inter alia*, to "conduct[] investigations, interviews, and counsel patients, family and other relatives in order to determine and ascertain the[ir] financial ability to pay for services rendered" and "register new patients and issue clinic cards." *id.* p. 3 ¶ 8.

Beyond his conclusory statements that he is substantially limited in the area of working, Garcia has simply not pled any facts to support that his "impairment[s] substantially limit[]

---

[13] Garcia states in his opposition to the motion to dismiss that he also has an impaired ability to concentrate, Opp'n. at 16, but the FAC does not contain any such factual allegation.

his . . . ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." EEOC Interpretive Guidance. Such was required of him. *See Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019) ("Congress did not modify the definition of the major life activity of working [in the 2008 amendments], and a plaintiff who alleges a work-related disability is still required to show that her impairment limits her ability to 'perform a class of jobs or broad range of jobs." (internal quotation marks omitted)), *cert. denied*, No. 19-252, 2019 WL 5686496 (U.S. Nov. 4, 2019); *Mancini v. City of Providence*, 909 F.3d 32, 42 n.6 (1st Cir. 2018); *Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015); *Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 835 (10th Cir. 2011) ("Thus, we conclude based on our existing case law, Supreme Court case law, the applicable statute, and the regulations, that to show a disability in the major life activity of working, [plaintiff] was required, even after the enactment of the ADAAA and the modified EEOC regulations, to demonstrate that she was substantially limited in performing a class of jobs or broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities."). In particular, Garcia has not pled facts to establish that he is limited from working in his chosen field of healthcare, or even his chosen role of HCI. Rather, he has pled solely that he is unable to perform the duties of an HCI in particular workspace environments within the hospital. FAC p. 24 ¶ 117.

Garcia's inability to perform a particular job at a particular location, or even at several locations, within the hospital where he has long worked, does not, without more, mean that he has a substantial limitation to the major life activity of working. *See Murtha v. N.Y. State Gaming Comm'n*, No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *10 (S.D.N.Y. Sept. 17, 2019); *Krachenfels*, 2014 WL 3867560, at *14 & n.11. Perhaps facts exist that would have

fortified such a claim, but Garcia has not pled them. Because Garcia has failed to plead facts

supporting that he is substantially limited in the major life activity of working, he has failed to

adequately plead that he is a person with a disability under the ADA. *Rodal*, 369 F.3d at 118.

The Court must deny his ADA discrimination claim for failure to state a claim.

### 2. Garcia's Retaliation Claim

Garcia also appears to claim that he was retaliated against in violation of the ADA.

Opp'n. at 17, 18; FAC p. 6 ¶ 40, p. 7 ¶ 54, p. 15 ¶ 105, p. 20 ¶ 132. Courts in this Circuit apply

the Title VII retaliation test to ADA claims of retaliation. *Sarno v. Douglas Elliman-Gibbons &*

*Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) ("[W]e conclude that it is appropriate to apply the

framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation

under the ADA."). Thus, "[t]o establish a prima facie case of retaliation under the ADA, a

plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA,

(2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff

occurred, and (4) there existed a causal connection between the protected activity and the

adverse employment action." *Id.*

As an initial matter, the Court's conclusion that Garcia has not pled sufficient facts to

establish that he is disabled within the meaning of the ADA does not preclude him from bringing

an ADA claim of retaliation. *See Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999). "[A]

plaintiff need not establish that the conduct he opposed was actually a violation of the statute,"

because, for example, he is not disabled within the meaning of the ADA, "so long as he can

establish that he possessed a good faith, reasonable belief that the underlying challenged actions

of the employer violated that law." *Id.*

Read in the light most favorable to him, Garcia appears to claim that H+H relocated him to workstations that exacerbated his disabilities in retaliation for filing a complaint with his union alleging H+H's decision to promote a coworker reflected discrimination against him. However, Garcia has failed to plead sufficient facts to support a prima facie claim of ADA retaliation because he has failed to allege that his complaint about the promotion decision "engaged in an activity protected *by the ADA*." *Sarno*, 183 F.3d at 159 (emphasis added).

"An employee's complaint may qualify as protected activity, satisfying the first element of this test, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. And not just any law—the plaintiff is required to have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by" the ADA. *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks and citation omitted) (analyzing first prong of the retaliation test in the identical context of Title VII); *see also Gregory v. Daly*, 243 F.3d 687, 700–01 (2d Cir. 2001) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotation marks and citation omitted)) (Title VII retaliation); *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001) ("[T]he employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII. Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotation marks and citation omitted)) (Title VII retaliation); *Muller*, 187 F.3d at 311 (same) (ADA retaliation).

Here, Garcia has not pled any facts to suggest that H+H's decision to promote his coworker instead of him violated the ADA or that he ever complained to his union that it did. Rather, as alleged, Garcia challenged the promotion decision as unlawful on other grounds: that H+H's failure to post the position on its website breached its internal policies, FAC p. 5 ¶ 31, p. 17 ¶ 107, p. 21 ¶ 141, p. 25 ¶ 162, p. 28 ¶ 178, p. 29 ¶ 135, and that H+H "discriminate[d] against [him] on the basis of his race [by] failing to provide [him with] the opportunity to apply for the position [to which] it promoted" his coworker, *id.* p. 29 ¶ 134; *see also id.* p. 21 ¶ 140, p. 25 ¶ 161, p. 28 ¶ 177. Although this complaint, sounding as it does in Title VII, could have (if otherwise well-pled) supported a Title VII retaliation claim, it does not describe protected activity *under the ADA*. And Garcia's FAC does not plead that Garcia had a good faith belief that in filing his complaints, he was engaging in protected activity under the ADA. *See Muller*, 187 F.3d at 311 (retaliation claim sufficient if plaintiff had "a good faith, reasonable belief that the underlying challenged actions of the employer violated" ADA).

The Court therefore dismisses Garcia's ADA retaliation claim for failure to plead a prima facie case.

### D.     Garcia's § 1981 Claim of Discrimination

Garcia also claims discrimination in violation of 42 U.S.C. § 1981. Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id.* § 1981(a). "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to

discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

Garcia's § 1981 claim relates to the promotion he did not receive. He alleges that H+H "interfered with [his] right to contract the sale of his labor by denying him the equal opportunity to apply for a position and advance within his employment." FAC p. 28 ¶ 179. H+H responds that Garcia is precluded from bringing this claim because the SDHR considered and rejected this claim on the merits, Def. Mem. at 9; Reply at 2, and that his claim fails on the merits.

The Court rejects H+H's claim of issue preclusion. Under New York law, which governs issue preclusion, *see Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 730 n.7 (2d Cir. 2001) (citing *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)), issue preclusion occurs if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding," *see Vargas v. City of New York*, 377 F.3d 200, 205–06 (2d Cir. 2004). "The burden of proving identity of the issue rests on the proponent of collateral estoppel [here, H+H], while the opponent bears the burden of proving that he or she did not have a full and fair opportunity to litigate the issue." *Kosakow*, 274 F.3d at 730.

H+H has failed to show an identity of issue between Garcia's SDHR complaint and the FAC. Garcia's § 1981 claim is based on H+H's failure to promote him. FAC p. 28 ¶ 179. But as explained earlier, his SDHR complaint did not allege this as an instance of discrimination. There is thus no identity of issue between the SDHR complaint and the § 1981 claim here.

In any event, H+H's preclusion argument would fail because Garcia did not have a full and fair opportunity to litigate this claim in the SDHR proceeding. "In determining whether a

party had a full and fair opportunity to litigate the issue, the New York Court of Appeals has instructed that 'the various elements which make up the realities of litigation,' should be explored, including 'the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation.'" *Kosakow*, 274 F.3d at 734 (quoting *Schwartz v. Pub. Adm'r*, 24 N.Y.2d 65, 72 (1969)). In *Kosakow*, the Second Circuit held that a plaintiff, whose FMLA claim the SDHR had rejected for lack of probable cause and who did not appeal that decision to the New York Supreme Court, lacked a full and fair opportunity to litigate her claim, and therefore was not precluded from bringing it in federal court. *Id*. at 736. The Circuit noted, among other factors, that no discovery had been taken in the SDHR proceeding, and that no hearing had been held at which plaintiff could call and cross-examine witnesses and submit evidence. *Id*. at 734–36. Rather, the determination appeared to have been made on the papers. *Id.*. The Circuit further noted that plaintiff had proceeded *pro se* before the SDHR. *Id.* Applying the *Schwartz* factors, 24 N.Y.2d at 72, the Circuit in *Kosakow* found that issue preclusion could not fairly apply. *Kosakow*, 274 F.3d at 736; *see also Elliott*, 478 U.S. at 797–98; *Allied Chem. v. Niagara Mohawk Power Corp.*, 72 N.Y.2d 271, 276–77 (1988).

This reasoning yields the same conclusion here. As in *Kosakow*, 274 F.3d at 734, the SDHR's decision in Garcia's case states that it found "no probable cause" "after investigation," but it does not indicate that any discovery was taken or any hearing held, and Garcia also appears

to have proceeded before the SDHR *pro se*. Consistent with *Kosakow*, and cases applying it,[14] the Court finds Garcia is not barred by issue preclusion from bringing his § 1981 claim challenging H+H's failure to promote him.

H+H's challenge to the substance of Garcia's § 1981 claim, however, presents a different question. *See* Def. Mem. at 9–11; Reply at 2–3. The Court agrees that Garcia has not pled a prima facie case. "[T]he express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for [a] violation of the rights guaranteed in § 1981 by state governmental units." *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). Here, Garcia has sued only H+H, an arm of the city. Therefore, to successfully make out a prima facie case under § 1981, he must plead facts sufficient to support a claim of § 1983 municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 692–94 (1978), *i.e.*, that the "challenged acts were performed pursuant to a municipal policy or custom." *Duplan*, 888 F.3d at 621 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)). To show a municipal policy, custom, or practice,

> the plaintiff need not identify an express rule or regulation. It is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials. A policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. Liability of a municipal defendant or an individual sued in his official capacity under § 1981 and § 1983 cannot, however, be premised on a theory of *respondeat superior*.

---

[14] *See, e.g.*, *Scarborough v. U.S. Sec. Assocs.*, No. 19 Civ. 2037 (DLC), 2019 WL 3369456, at *2–3 (S.D.N.Y. July 26, 2019); *Saudagar v. Walgreens Co.*, No. 18 Civ. 437 (KPF), 2019 WL 498349, at *9–10 (S.D.N.Y. Feb. 8, 2019); *Basak v. N.Y. State Dep't of Health*, 9 F. Supp. 3d 383, 398–99 (S.D.N.Y. 2014).

*Patterson*, 375 F.3d at 226 (internal citations and quotation marks omitted).  A plaintiff pursuing

a claimed violation of § 1981 or denial of equal protection under § 1983 must also show that the

discrimination was intentional.  *Id.*

Garcia's FAC falls far short of this standard.  It does not plead any facts to support his

claim that H+H's decision not to promote him was the result of racial discrimination, let alone

that this was pursuant to a policy, custom, or practice.  To the contrary, Garcia alleges that his

supervisor Pascal breached required policies by promoting Louissant without posting the

position.  FAC p. 5 ¶ 31, p. 29 ¶ 135.  The FAC also does not plead facts suggesting that Pascal

was an official with final policymaking authority for the purposes of municipal liability, *see*

*Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000), that any other such policymaker ordered or

ratified Pascal's decision, *Amnesty Am. v. Town of W. Hartford*, 361 U.S. 113, 126

(2d Cir. 2004), or that a policymaker "exhibit[ed] deliberate indifference to constitutional

deprivations caused by subordinates, such that the official's inaction constitutes a deliberate

choice[] [and] that acquiescence may be properly thought of as a city policy or custom that is

actionable under § 1983," *id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

The Court therefore dismisses Garcia's § 1981 claim.

### E.      Garcia's § 1983 Claim of Discrimination

Garcia's final federal law claim, under 42 U.S.C. § 1983, FAC pp. 28–29 ¶¶ 128–38,

embraces both his claim of a discriminatory failure to promote and his claim of discriminatory

retaliation.

Garcia's § 1983 failure to promote claim fails for the same reasons as his § 1981 claim.

His FAC does not, *inter alia*, plead facts to establish *Monell* liability.

Garcia's § 1983 retaliation claim fails for the same reasons as his Title VII claim.  "[T]he

elements of a retaliation claim based on an equal protection violation under § 1983 mirror those

under Title VII." *Vega*, 801 F.3d at 91. "[F]or a retaliation claim under § 1983 to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed discrimination." *Id.* Garcia's § 1983 claim alleges that, in retaliation for his complaints about the allegedly improper promotion of his colleague, H+H "thereafter retaliate[ed] against [him] by relocating him in direct conflict with his medical restrictions." FAC p. 29 ¶ 137. But, as reviewed earlier, Garcia's relocation within the hospital did not rise to the level of an adverse employment action under Title VII. It therefore cannot constitute an adverse employment action for the purposes of § 1983. *Vega*, 801 F.3d at 91. Further, as noted earlier, Garcia has not pled sufficient facts to support a claim of retaliation under the ADA. His FAC, in any event, does not claim that the retaliatory conduct at issue was pursuant to a municipal policy or custom.

For all these reasons, the Court dismisses Garcia's § 1983 claim.

## F. Garcia's Claims Under the NYCHRL

The Court now turns to Garcia's two claims under the New York City Human Rights Law ("NYCHRL"), for discrimination, N.Y.C. Admin. Law § 8-107(1); FAC pp. 26–27 ¶¶ 165–70, and retaliation, N.Y.C. Admin. Law § 8-107(7); FAC pp. 27–28 ¶¶ 171–79. The conduct underlying these claims tracks that alleged in Garcia's federal claims.

H+H argues that these claims are almost entirely barred by the doctrine of election of remedies. Def. Mem. at 11–12; Reply at 3. The election of remedies bar is jurisdictional, such that claims dismissed pursuant to it must be dismissed under Fed. R. Civ. P. 12(b)(1) rather than Rule 12(b)(6). *Moodie v. Fed. Reserve Bank*, 58 F.3d 879, 882 (2d Cir. 1995).

Section 8-502 of the NYCHRL provides that an individual will not have "a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for

injunctive relief and such other remedies as may be appropriate" if they "filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence." N.Y.C. Admin. Law § 8-502(a). H+H argues that this bars Garcia from bringing a cause of action in this court for any claim he raised, or could have raised, with the SDHR when he filed his complaint on January 4, 2018. Def. Mem. at 12; Reply at 3.

The Court, mostly, agrees with H+H. "[B]y the terms of the . . . code . . . [NY]CHRL claims, once brought before the [SDHR], may not be brought again as a plenary action in another court. Furthermore, once a plaintiff brings a case before the [SDHR], he or she may appeal only to the Supreme Court of State of New York. [Garcia] failed to appeal the adverse rulings by the [SDHR] to the Supreme Court of the State of New York, and [has] instead attempted to relitigate [his] claims in the United States District Court, in contravention of the . . . code scheme[]" detailed above." *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002). Thus, the election of remedies provision in the NYCHRL provides a "direct bar" to the alleged claims of discrimination and retaliation brought in the FAC to the extent that "(1) [Garcia]'s complaint to the SDHR expressly included these claims, [and] (2) the SDHR concluded after an investigation that there was 'no probable cause' to believe such prohibited conduct occurred" because "when the SDHR has issued a finding of no probable cause[,] . . . [a] plaintiff has already litigated the claims before the SDHR." *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 188 (S.D.N.Y. 2011) (alterations omitted); *accord Williams v. City of New York*, 916 F. Supp. 2d 517, 522 (S.D.N.Y. 2013).

The election of remedies provision in the NYCHRL also bars Garcia from bringing a NYCHRL claim in this Court to the extent that the claim "aris[es] out of the same incident,"

*Higgins*, 836 F. Supp. 2d at 188, or is "based on the same operative events he presented to the SDHR," *id.* at 189; *see also Williams*, 916 F. Supp. 2d at 521–22; *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 225 n.3 (S.D.N.Y. 2010). "That is because the New York Court of Appeals has interpreted the State Human Rights Law as precluding an action in court that is based upon the same incident as the Agency complaint." *Higgins*, 836 F. Supp. 2d at 188 (internal quotation marks omitted); *see also id.* ("The election of remedies bar also precludes consideration of any claim—whether brought under the NYSHRL or the NYCHRL—arising out of the same incident on which [plaintiff]'s SDHR complaint was based."); *Moodie*, 58 F.3d at 883 (citing *Emil v. Dewey*, 49 N.Y.2d 968, 969 (1980)).

This doctrine precludes the majority of Garcia's NYCHRL claims. But not all. As noted, Garcia's SDHR complaint did not mention H+H's discriminatory failure to promote him. Garcia raises that claim for the first time in this Court. The Court therefore has jurisdiction to hear Garcia's failure to promote claim under the NYCHRL. FAC p. 25 ¶¶ 158–62. The Court similarly has jurisdiction to hear Garcia's NYCHRL claims relating to incidents which occurred after he filed his SDHR complaint on January 4, 2018. These include, *inter alia*, his claims that a co-worker "placed her hand on [Garcia's] rear end" and allegedly stated, "I've never seen a man with a butt so big," FAC p. 17 ¶ 109, a claim which H+H concedes is not precluded by the election of remedies doctrine, Def. Mem. at 13; Reply at 8, and his claim that he was called "Skittles" by a coworker and that coworkers left Skittles wrappers around his workstation, FAC p. 18 ¶ 118, p. 20 ¶¶ 130–31. The remainder of Garcia's claims under the NYCHRL, however, are precluded by the election of remedies doctrine. The Court dismisses them pursuant to Rule 12(b)(1).

As to Garcia's NYCHRL claims that are not dismissed, the Court must determine whether to exercise supplemental jurisdiction over them. Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may, at its discretion, "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has instructed that, in deciding whether to exercise supplemental jurisdiction, a district court should balance the traditional "values of judicial economy, convenience, fairness, and comity," *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), and that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well,'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7).

Here, no circumstances counsel in favor of exercising supplemental jurisdiction over Garcia's remaining municipal law claims, given the Court's dismissal of all of Garcia's federal claims. The Court has not invested the judicial resources necessary to resolve these non-federal claims or even determine if Garcia has pled sufficient facts to make out a prima facie case. Nor do convenience, fairness, or comity require the Court to exercise supplemental jurisdiction. Finally, dismissing the municipal-law claims now, at the motion to dismiss stage, would not cause substantial delay, because the parties have not yet engaged in discovery. The Court

accordingly declines to exercise supplemental jurisdiction over Garcia's remaining NYCHRL claims. These claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants H+H's motion to dismiss all of Garcia's federal claims, with prejudice. The Court also grants H+H's motion to dismiss, with prejudice, Garcia's claims under the NYCHRL, with the exception of his claims challenging H+H's failure to promote him and his claims arising out of incidents that occurred after he filed his SDHR complaint on January 4, 2018. As to these NYCHRL claims, the Court declines to exercise supplemental jurisdiction and therefore dismisses them without prejudice.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 18 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 17, 2019
          New York, New York